Mr. Dillard Larson. Yes, Your Honor. Are you ready? I am indeed. Okay, come on up. And I just want to confirm, you've taken 13 minutes of your main argument and two of rebuttal? That's correct, Your Honor. Let me, if I could, and I want to get right to the point that is on my mind here, and again, I can only speak for myself, I can't speak for my colleagues, Judge Clevenger and Judge Lin, but you've brought to us an appeal from an inequitable conduct determination. Correct. And we all know the law, there has to be a clear and convincing case of materiality and intent, and there's a balancing. The district court here found materiality based on, I'll call it five things, okay? The third and fourth office actions, the preferred engineering literature, the, I guess the genius literature, and the German pact. Now, it seems to me that our case law, thinking of DACO and other decisions, is pretty clear that you can't really quarrel with the district court's determination on the office actions in the continuation application. You may quarrel with that, but for my question, the purposes of my question, what would be helpful to me if you could explain as concisely and from your standpoint as effectively as you can, why there is clear error in the determination of non-cumulativeness with respect to the preferred engineering literature, the genius literature, and the German pact. I apologize for that long-winded, but I wasn't afraid of it, and now, go ahead. Your Honor, I'm delighted. You've got it. You understand. But I will say with respect to... Don't get on the ladder, but... No, no, no, I understand, but with respect to the office actions, we'll have to differ with those, and I will address those. But the... Just focus, if you could, on those. I will. I will focus on those references. The first reference was the preferred literature, and this was a reference or a brochure, if you will, that showed a screen that could travel in tracks, had an elongated bar that would travel in tracks, and that's it. That's what it showed. Our position was that the Kemp patent, which was before the patent office, showed that very thing. In fact, Kemp was a little bit different because it added the fact that the bar, which traveled in the tracks, could be attached to glass. Is the key here issue the bar traveling in the tracks with weatherstripping? In between the weatherstripping. That's correct, Your Honor. That's the key. And the reason why, with respect to the preferred, that it was not cumulative is, first, the testimony of the expert was that, at least in part, his opinion was based on the fact that the preferred literature represented commercial stuff, stuff that was sold. So, therefore, that was an important part of his decision as to why it was material and was not cumulative to the Kemp patent. You're talking about the Hall testimony? That's correct, the Hall testimony. That was the Luminance expert. And the other thing, with respect to preferred, is that the... It's no more significant or insignificant whether it refers to something that was sold as to a picture of something that wasn't sold. Absolutely, Your Honor. And he bought the argument. But there's another reason why that... I gather what you're trying to do right now in this argument is to convince us that there's not clear and convincing evidence that the preferred literature was non-cumulative. You are correct, Your Honor. Because the data points are Kemp, the data points are you can't put the fellow on the scale against non-cumulation because of commerciality. What's the next point? The next point is that this preferred literature was known by IlluminArt before it filed its request for re-examination. And you had a case, you decided in your brief, that said... That's right, Your Honor. And that says, that weighs against finding that it's material. So that's the preferred literature. What about the genius? The genius literature, again, was this commercial literature. And again, the expert said, because it was commercial, that was part of his decision as to why it was not cumulative. But the genius literature showed a bunch of different screen configurations, including those that were retractable, that had a bar on the freehand... And which one is it, Your Honor? The Kissinger patent. Kissinger. And the Kissinger patent shows the very same thing. It has a retractable screen with a bar on the end that extends into... We've got a lot of issues here. I'm sorry I'm going to interrupt you. Not a problem, Your Honor. In order for you to succeed on knocking down the materiality because of the fact that you believe it's cumulative, do you have to show that Kissinger shows exactly the same thing as genius? Or do you have to show that there could be some doubt in a reasonable mind? Well, Your Honor... The standard is not... We're not dealing here with, like, judging by substantial evidence. Right. We're judging this by clear and convincing evidence. Right. So if there is some reasonable residual doubt... Then that ought to be in my favor. That tilts in your favor. Absolutely. It should, Your Honor. And what happens... The reason why I raise it is you said, well, Kissinger shows exactly the same thing. Right. And I would think your argument would be, if it shows exactly the same thing, then there's massive clear error on the accumulation issue. But you don't have to show... Right. Exactly the same. That's correct, Your Honor. I'd say, with respect to the three elements, that is, you have a retractable screen with an elongated bar that travels and tracks between weather stripping, the reason why the court was clear, or committed clear error, is because, again, the expert said, well, it's commercial. That's one reason. The other thing is, well, I'm not sure whether Kissinger has weather stripping. Because in order to be weather stripping, the brushes have to be against the screen. And his testimony was all over the map as to what was or wasn't weather stripping. But here's the important thing about Kissinger. Kissinger not only shows you what the invention was and shows you the brushes, but Kissinger also describes in words exactly what those brushes do. And the words are found in column four, lines one through nine, where Kissinger says, look, the edges of the screen panel are dressed on both sides in order for the smooth and burlesque edges to engage the opposing brushes. And that results in an insect-impeding structure. In another part of the patent... Which is closing up the weather stripping for a year or two. Absolutely. I mean, time is short. Right. What's wrong with the German patent? The German patent... For a non-human relationship. Okay, well, first, let's understand how German came up. German came up in the... The parenthetical. It was the parenthetical C also. And that equated... To your adversary in a bold parenthetical. Right. Right, and so the way that it came up wouldn't tip anyone to even look at it, because it suggested that the German patent was equivalent of Kemp, that it showed the very thing Kemp did, that is, an elongated bar that traveled in the tracks. But again, with respect to German, Your Honor, first, there was no translation of German other than the abstract. So all we had to go by were the drawings. And the expert said there wasn't any question in his mind that... Upon whom does the burden fall to become or not become responsible for the contents of a German-language patent? That's... Well, if their burden is to show that it was not punitive, the burden's on them. And so the fact that they didn't translate the patent... For all I know, the German patent has got a lot of stuff in it, so without question that it's not punitive. Your Honor, I don't think there's any argument about whether the German patent shows that it has brushes that are in contact with the screen. And so that's really not an issue here. The issue is whether German was cumulative to the Kissinger patent. And again, the Kissinger patent showed that these brushes were in contact with the screen, and it describes that functionality again. So there's not any question at all about it. Well, assume for purposes of argument, Your Honor, that you convinced the court that it was clear error for the district court to treat these three references as material highly, whether highly or not, because they're all cumulative. What's that get you? Here's where it gets me. Let's talk about the office action. Okay, let's talk about the office action. First we have to understand, what did the panel know about the office actions in the other case? The panel knew as a part of the request for reexamination that there had been a first office action, that there was a co-pending case, that the claims... Right. That's correct. That's correct. Yes. Yes. Yes, Your Honor. Yes. Correct. Okay. Correct. Because they already know it. I'm going to remind them again, they know it. By the way, he's done it again. He's looking at Johnson. They already know that he regarded the claims as antithetical. They know you convinced the continuation examiner, just like you convinced the reexam panel, that Johnson didn't stand in your way. Well, no, Your Honor, by the time they made the determination to allow the claims, what they thought about 039 is that the claims were rejected under Johnson. They didn't know that the claims were allowed. Now, they thought the claims were rejected under Johnson, under 102 and 103. And that wouldn't have changed had these other office actions been brought to their attention. Nothing would have changed. It still would have been that same fact. Well, maybe, maybe not. But the point is, isn't it, that the reasoning of the examiner in the third office action was not shared with the panel? The panel was aware of the existence of the 039 application, certainly aware of the prior part, but wasn't made aware of the fact that examiner Johnson was still having difficulties, and the reasoning that supported his problems. To the extent that he had any that differed from the other, Your Honor, but the fundamental fact remains that when they allowed the claims, they were under the impression that the 039 examiner was still rejecting the claims under 102 and 103 based primarily on Johnson. Is that because of the 104 rejection that you referred to? Is that because of the first office action? That's because of the first office action, yes, Your Honor. So you're saying because of the first office action, the reexamining panel was necessarily under the understanding, if you will, that Johnson was rejecting was the basis for rejection? Yes, in the 039 continuation, absolutely, Your Honor. That's correct. But they didn't know whether the examiner Johnson was persisting in his rejection or whether he had given up on his rejection and was persuaded otherwise. Wouldn't it have been at least of interest to the panel to know where examiner Johnson stood? Your Honor, what they knew about where he stood was that he had rejected the claims and what he said later on didn't change it. You're quite correct. They didn't know that he had said it four times. But what they did know is that he had said it. And I don't think that makes They also didn't know that the continuation panel had made the rejection continual for Johnson plus some more art. Right. And all of that art, by the way, was before the patent office. I understand the art was before assuming we wipe out the three pieces we wiped out. Correct. But the point is that the reexamining panel didn't know that those other pieces of art were being viewed differently by the continuation panel than they were going to be viewed by themselves. The continuation examiner was saying, you're still hung on Johnson. It's not only are you hung on Johnson, but I'm accumulating some more art that's problematic. Right. And they were telling you that, telling your client. Right. Right? Right. Now, that additional information that the continuation examiner Johnson had more arrows in his quiver for shooting at you than just Johnson, those arrows were known that they were there, but they weren't known to the reexamine panel that a fellow examiner was using them against you. That's correct. So that part of it is correct. Let me ask you this question. That's part of the reason why, as I think Judge Lynn suggested, that the law seems to be, at least at this stage in the game, where you're going to have co-pending applications of one sort or another reexam or just a whole series of continuations and whatnot. The law said, be a straight shooter. Be a straight shooter. And just make certain that the fellow on the 8th floor knows what's going on down on the 7th floor. Right. It's hard to argue against that as a legitimate policy, isn't it? Well, in fact, it is. It couldn't have been any greater a burden on your client to alert the reexam panel to the subsequent two office actions because you were sending modified IDSs, right? That's correct, Your Honor. You just could have added one more line to the IDS saying, oh, by the way, we got rejected again, not only just on Johnson but on Johnson Plus. That's correct, Your Honor. Mr. Guzman, let me ask you one question to sort of wrap up your time. Because of the questions you've had, you've stuck to your bottom. You're in the beyond or above, but we'll give you the above. Thank you. Let me ask you, assume, I know you want us to hold that there was no materiality because everything, there was no materiality with respect to the office actions in the three prior pieces that we discussed today. And that would obviously result in reversal if we came to that conclusion. Except, though, the possibility, what would be the correct result if we were to say, well, the office actions, the district court did not err in finding the office actions material. Okay. No question about it. However, we do think there was a lack of clear, convincing evidence with respect to the three pieces that we discussed earlier, preferred, genius, and the term act. And, again, I'm just speaking hypothetically for myself here. What would be the correct result if we came to that conclusion? Well, since it's- What would we have to do with, what should we do with the case at that point? I think in that instance, Your Honor, you'd probably have to send it back down because then he would have to weigh everything based on only the two office actions and not those other- Because he, as the judge, would have to look at intent based on the two office actions and then, depending on what he determined then, possibly have a balancing game. That's correct, Your Honor. Can I just make a point? I know we're running out of time, but I think this is important because it's an important issue. And what I want to say, I want to say against you on your direct argument, so your adversary will have a chance to win the battle because I think it's fair to them. Subsequent to the entry of the judgment in this case, this Court has decided to celebrate a star scientific case, which I'm sure you're familiar with. I am, Your Honor. And star scientific. We went to some trouble to point out that when you're trying to dial in the meter on the intent leg of an equitable conduct, if you're going to draw inference of improper intent, it has to be a single, most reasonable inference able to be drawn from the evidence. I believe that's the first time we've said that in those words. I would think that you would be arguing that you're entitled to have the intent in your case that would be drawn under Judge Schall's hypothetical just from the absence of the two office actions they reported. Yes, Your Honor. You're entitled to have that conduct viewed through what I would call the star scientific lens. Absolutely, Your Honor. And then I think you would also argue, I'm just saying this because I want the adversary to have an opportunity to win, but I think you also are mounting the argument that the trial judge unfairly taxed you on the intent prong with the wrong kind of intent because you made a disclosure to the continuation panel of your victory at the re-exam but didn't reverse. And your argument is you have a legitimate reason, i.e., the double patent issue for having made that one-way disclosure. Correct. And you would feel that that point should be raised for the district court in terms of the balance. Yes, Your Honor. And you also argue at some length that you were robbed by the district court of the good faith inferences that you were not allowed to have drawn. From the economic column, I guess, correctly. Yes, Your Honor. Just one question. In terms of star scientific and the conclusion that to find a threshold level of intent and to infer intent, that inference must be not only a reasonable inference but the most reasonable inference to be wrong. Right. Now, with respect to the references, you could say, well, all right. There might be other reasons why they might not have been disclosed. Maybe they're human or maybe the prosecuting attorney overlooked them, simple negligence, and any number of different reasons. So it might be hard to contend that an intent should be inferred simply by the failure to disclose. Right. With respect to the office actions, you can't say that they were cumulative of anything. That really doesn't directly apply. It's a different twist on that. I'd have to disagree with you, Your Honor, on that point. And in terms of, well, you know, we just overlooked it. It's hard to say you might have overlooked it when he cited the references to cite the office actions. Right. The examiner. What reasonable inference could be drawn other than the intent to deceive? Because the fundamental information gleaned from all of the office actions was before the patent office or before the panel. And these nuances that might have appeared in the two office actions that were omitted wouldn't have changed anything. They wouldn't have been important to an examiner, Your Honor. And I don't believe that given all that information, you can say then, oh, now, the single most reasonable inference that we could make is they were trying to deceive the patent office because they didn't submit these last two items. Thank you, Your Honor. Thank you. Yes. We'll restore your full three minutes of rebuttal. And we'll hear from the Illuminati. Mr. Morgan, before you start, I'm going to do a housekeeping matter here. Let's see. Mr. De La Garza used his rebuttal time. We're going to restore that. Plus he went over, I'm going to call it six minutes. This is five minutes and 45 seconds. But we'll call it six minutes. So he is going to have nine extra minutes to his time. So we're going to restore his rebuttal. In addition to that, he used six extra time. Those are all questions. So to make even it out, we'll give you an additional nine minutes to your 15. I think that will work it out. So you'll have 24 minutes. Thank you, Your Honor. If you need it. I'm not sure I will need it. Just to make sure everyone gets the same amount of time. I'm not sure whether the record reflects. I am Al Kowalczyk in reference to Mr. Morgan. Oh, I apologize. You know, don't start. Sorry. I apologize, Mr. Morgan. Correct. Mr. Kowalczyk, I was looking at the case above that, and thank you for correcting me. It's always disconcerting to be misaddressed, and I apologize. Oh, no problem. But anyway, just one other thing for you, sir. You want two minutes for your rebuttal, I guess. At this point, let's be direct. If I need it. All right. Okay, go ahead. If it pleases the court, the district court properly found an equitable conduct in this case, and I believe you're going to be asking questions about the materiality and the accumulative nature of some of these withheld items. But one thing I would like to have as an overview of that is that Larson's patent, in this case, involved nothing more than installing a commercially available retractable screen into a door, and they withheld that information from the reexamination panel. The retractable screen literature from Genius was Larson's own supplier's retractable screen system. The German patent that came through the continuation process was a retractable screen patent that was also withheld. The retractable screen literature key, the components that you mentioned in addressing Mr. Della Garza, the strip traveling in the channels between the weatherstripping— Kissinger is not retractable? Kissinger is retractable, and if you would like that— Well, then, so what's the beef? Kissinger did not show weatherstripping in those channels, and it— That's the question. I mean, instead of standing up here and trying to tell me, I mean, I didn't disclose the retractable screen, and you just now admittedly did. Tell us why there is clear and convincing evidence, if you will, that Kissinger doesn't disclose weatherstripping. Because what was disclosed— You should talk about the lines in the Kissinger patent that Mr. Della Garza talked about. Very good. You will see in the lines of column four of Kissinger. What— It was column four, and I believe it is— This has a joint appendix. It is A245. This is a relevant page that I believe Judge Klobinger is directing my attention to. 245? Yes, that's what it is. Page 249, column four, where it talks about the brushes. Line number? I think you can start at line one through line nine or ten is the entire discussion of the feature. And in this discussion, you have to put it into the context of the invention that Kissinger is describing. And that is, you're looking at a simple pull screen. Yes, the pull screen retracts. It can be extended. But the pull screen has as a feature rubber bumpers 31 and 30, which you see in figure five of the patent at page A247. And those rubber bumpers hold the pull bar of the screen in place. This is a door that you pull across an opening, and it just stays wherever you engage it. The insect impedance— Are you telling me that weatherstripping can't be proposed to work? That is— You do, but in all the windows I have in my house, the weatherstripping rubber got the wrong thing. Your Honor, that's not the weatherstripping that's being referred to in this path. The weatherstripping being referred to is items 35 and 36, these brushes. And those brushes, when you look at this invention that's described in Kissinger, those brushes are not shown to be engaging or retaining the screen edges. The invention that Larson— Is that one of the drawings? Yeah, that would be looking at figures five and seven on A247. And these, I believe, were put into Larson's brief. When you look at figure seven, figure five with these bumpers that hold the pull bar in place, those bumpers holding the pull bar, behind that is the screen. The screen's behind the pull bar. And that screen has a dimension far less than the pull bar. It's much thinner. What are the brushes? Are there 36 of the brushes? Right, 35, 36 are the brushes. You'll see that those are recessed in the channel. And the purpose of them being recessed is that they serve to impede insects in the track. They are not there for the purpose of restraining the screen, the edges of the screen, in place. So this could be one of scaling the art understanding of sufficient to keep an insect out of the track, sufficient to keep a drop of water out of the track. It's not the drop of water, your honor. It's whether these brushes serve to retain the screen edges. Remember the old roll-down windows in your car? And what it had were brushes, right? Correct. These brushes are— They were for brushing. Yes, and those brushes that you just described, your honor, are engaging the window. When you roll it down, they're engaging the window. This is the level of fact-finding that Judge Pearsall engaged in. Right. I've heard that it was on your plan to prove by fair and convincing evidence, right, that Kissinger was not doing it. Fully met, your honor, in the evidence. Because Dr. Wall testified specifically that the genius literature, the brushes and the pile, this brush pile there showing, that did precisely what you were talking about, which is when you hold it in place, it will contact what you're retracting and extending. Continuously, these brushes don't touch the screen except inadvertently when you're fluttering or gapping. That is not screen retention. I'm just wondering why you say that it does not touch the screen. Doesn't it say on column 493, the burlesque edge is to engage the proposed brushes? And then it goes on, Judge Lynn, to talk about to resist gapping or fluttering. It's not talking about use of this recessed bristles for purposes of when you are extending and retracting the screen. Would it say that the brushes are recessed? The picture, when you look at figures 5 and 7 together, that's precisely what it shows in the brushes. Well, you're right on the side, Mr. Project. If a particular reference is going to be cumulative or non-cumulative, can't we also say, well, what would one of ordinary skill in the art understand from this disclosure, say, here in column 4? Wouldn't one of ordinary skill in the art understand that brushes can also be used for weather-stripping? In what? They should probably not get flipping. Correct, but the evidence at trial by Dr. Hall was that that was not the purpose that they were being shown in Kissinger. That was precisely what the purpose was in the genius literature, which just so happened to be the retractable screen system that Larson was putting into their own product, a more material reference. You could not have a genius because it's what Larson put into their patented product. That level of distinction. Are genius and the preferred, which I'll call commercial art, are they entitled to more weight in a materiality setting because they are commercial art as opposed to a picture-in-a-book? Not solely on that basis, Your Honor. I believe that would be error if a district court judge said, I'm finding this particular piece of art material because it's commercial art as opposed to technical. That would be error. I believe that would be, because that's not what Judge Pearsall did. He found specifically that there were distinctions based on the evidence at trial between Kissinger and genius. Genius being the retractable screen that you just pull off the shelf and implement in a door. When you look at materiality, would an examiner find it to be important to the examination? The fact that you've got extensive literature showing brush piles, strips, that was clearly evidence that genius. I don't understand your aggressory to be arguing that the three art references are things that an examiner would have found uninteresting. I think he's got his eggs in the accumulation basket. I think that's correct, Your Honor. I believe that the cumulative art basket must look at the nature and the full content of what you're comparing. So when you compare genius as the screen that you pull off the shelf, put in the door, compared to a patent that respectfully is being interpreted by Mr. De La Garza, there was an opinion given to you of what this shows. The words aren't there. Judge Pearsall judged the evidence. He judged the cross-examination of Dr. Hall when it was repeatedly attempted to get Dr. Hall to admit it was weatherstripping and that it was weatherstripping for the purpose of retaining the screen edges in operation. And that was a very important feature. And to the extent genius didn't show it, when the German reference came forward, as the brief shows you in the pictures of the German reference, there could be no question that that German reference specifically addressed making sure you had some tight contact in the screen channel between brushes and the edges of the screen so as you're using this retractable screen, going up and down regularly, the screen isn't going to come out of the track. So where's that German reference now? Which picture are you referring to next to the German reference? I have... The German... I think it's... I was looking at it yesterday. On the German patent, it is at 2040. The drawings of the German patent started at 2050. By the two German patents. And I just... You see, we're focusing on what it showed. I was wondering what drawing you were taking. Okay. As I showed, at page 12 of the red brief is where the figures are actually reproduced from the appendix. Figures 3 and 4, which show the interaction of the channel brushes with the screen, specifically in figure 4. And so the feature of the importance of screen retention is, to the extent anybody could argue with genius, somehow the brush pile not being of a higher caliber of disclosure than the Kissinger patent, the German patent closed the deal. And that was withheld. And in the argument, there was some discussion about the office actions being withheld and the consequence of that. What was not... I call it the second chain of non-disclosure. You have the patent office non-disclosures, you have the commercial literature non-disclosures. In the patent office non-disclosures, not only did you have the office actions continually saying, hey look, these substantially similar claims, we're not buying the argument, they're rejected. The second office action, the June 06 office action, included this German patent being given to Larson. And not only was the office action not provided, This was the third office action? Correct. The office action included a copy of this German reference, and it wasn't passed on to the re-examination panel. This is where we have the parenthetical right after Kissinger, correct? Correct. And if you had your way, you would take back, I mean, quote, unquote, Absolutely, Your Honor, I apologize. Emphasis added should have appeared in the quote. But the literature, and if I could just get back to preferred for a second, because we haven't talked about preferred on the count, and the idea of commercial literature, it's what is in the commercial literature, not just that it's commercial literature that's important. The preferred engineering literature was the very screen system that was being implemented by Illuminati to accuse the infringer in their product. It was implementation literature, again, showing how easy it is to just take that your client did not disclose it to the re-exam panel, which you were triggered. Your Honor, if I could explain that. The re-exam was brought on the basis of the Johnson patent coming up for the first time. The purpose of the re-exam proceeding was to destroy the patent so that you could go back to the district court to state the actions on the dismissal complaint. Correct? We were fully It was war. And we were fully comfortable that Johnson Primarily in war, you launch every missile you have, including the dust. Right? We thought You did not find it necessary to tell the re-exam panel about the preferred on. At the time. At the time. We believed that the Johnson patent being used to anticipate the claims in the continuation case and being dead on, in our view, with the claims of the patent suit Was Johnson the only art you cited in the brief game? The only other art used, Your Honor, was underlying secondary art from the original patent application. Preferred did not become highly material until Larson started to argue with the re-exam board that, oh, the distance the strip is not in the channel is a grounds to distinguish the invention. At that point, the art of alchemy and industry strips that went into the channel, like preferred, became highly material. At that point in the process, we were well into the ex parte prosecution of this by Larson, who had the obligations relative to the preferred information. On the front end, it wasn't viewed as the basis. It wasn't put in the arsenal. Later, it became important. Secondarily, not only was it the dead-on commercial literature type of materiality, when you look at Kemp itself, Judge Pearsall made his evaluations. Kemp is a 1938 patent on a screen system. And if you look at page 10 in the brief, where we recreated the page from the preferred engineering brochure, with page 10 and, if you prefer, in the appendix, it appears at A2293. That's a blow-up picture of that preferred screen system. Correct, Judge. This preferred engineering literature, you see, has guides for the screen, down at the top and the bottom. You'll see they're identified as profile with groove to accept Y. Profile. When you look at that profile, what you see is a very constricted profile for the screen to travel in the constriction at the top of the profile. Kemp was just an open-channeled groove that the screen went up and down. This thing here, is this a screen? Yeah, this is what we call a screen module. If you orientate the page the long way, you'll see that what's called a profile with grooves would be your side tracks. This picture is broken apart. You have to slide it all together to see the screen. Correct. It's a window screen. Correct. It's the window screen that Illuminar and the testimony of trial indicated was simply put into the product that was accused of infringing. Prior art product put into the accused infringing device. That information known to Larson and never turned into the patent office. This was not Kemp. This was the literature of what was put in the accused product. It was prior art. It was highly material to the point of being an obvious invention to just stick the screen into a door. So Kemp was not, this literature was not keyword to Kemp. So I think I've addressed the German reference, Kemp and Kissinger and Genius, as to the evidence in the record. Judge Pierson. Your strong argument is that standard review here is one of us finding clearer. I believe that's correct. And I also believe that the fact that there was no evidence offered in the way of testimony in this case is quite dramatic. I think on appeal you see the arguments that were offered in argument by Larson's counsel at trial, and they were found not to be credible in view of the evidence. Suppose I ask in regard to you, you mentioned the evidence that was put in. In a situation like this, the alleged infringer who is asserting inequitable conduct has to establish its case by clear and convincing evidence on the issues of materiality and intent. Now, assume we're in a situation like we are here where cumulativeness is an issue. Does the alleged infringer have to come in and put in all of the evidence of prior art and make an affirmative case as to why there is non-cumulativeness? Or once the alleged infringer comes in, even though the burden remains on it, does the patentee have to come forward with evidence showing cumulativeness? Did I say it clearly? I understand, Judge Shaw. I believe that there is some burden once you've gone forward showing the evidence of materiality. The issue of cumulativeness does require some evidence from the patentee to rebut that. Because as I looked at the case law, I am cumulative. But that's cumulative. It's not material. So isn't it the accused's burden to establish materiality? And doesn't that carry with it the obligation to show that it's not cumulative? I believe that, yes, I believe that's true. And it was done. It was an obligation to address cumulativeness after putting forth the clear, convincing evidence that it was material. The basis for materiality were provided. The testimony at trial by Dr. Hall also addressed why he didn't believe it was cumulative of the references that were before the court. So I believe your adversary's brief in Case 55 alleged that you, the client, was required to demonstrate by a clear, convincing evidence that the omitted information was not cumulative. And I didn't understand you trying to predict that in the brief. You understood that was your burden? Correct. But the standard of cumulative So whether the patentee does or does not have an obligation to come forward once you have put non-cumulation at issue, does it affect your burden? No. Our burden of proof is the same. And I think it's quite clear how you address them. It matters in a way because you, a minute ago, said, well, the patentee here, they just had a legal argument. But if there was no burden on the patentee, the burden of coming forward once an issue was raised, because the entire obligation to prove non-cumulation rests with you, then the patentee can just sit there and zip his lip if he wanted to, and it would not cost him anything. I am not sure, to Judge Schall's question, that it's clear the burden of clear, convincing evidence attaches to showing materiality, Art. I also believe there is a responsibility in showing that, that you establish it's not cumulative of other information that's being considered. Why make the patentee have to say anything with regard to the issue of cumulation and non-cumulation? What's wrong with putting the entire burden on the attacker? You have to prove a negative, but there's no problem if you know what the error is. I think the problem with it, Your Honor, is that when you get to a situation like this, the cumulativeness argument allows attorneys to come forward with constructions, interpretations, opinions that are not subject to challenge by cross-examination. You can make up whatever you want in an argument about what a reference shows. You're not talking about burden of proof. You're really talking about the weakness of the other side's case. Correct, and I think the standard had been met in this case. Let me ask you this, Your Honor. Whether or not your 24 minutes is all gone except for about a minute and 50 seconds, I asked a hypothetical question to your opposing counsel, Mr. Bill Garza, about, assume for the moment we agreed that the office actions that weren't disclosed were material, but that we disagreed and felt that a clearly convincing case had not been made out with respect to the three references. He said that at that point, the case would have to, if that result were reached, the case would have to go back for a determination of intent in that light, and then if there was a finding of the requisite intent, the balance. Do you agree or disagree with what he said in response to that hypothetical? I disagree, Your Honor. I believe that under cases such as the Monsanto case, I believe if you have one, on all fours, case of inequitable conduct through highly material information withheld with evidence of intent supporting it, I believe that that is adequate to affirm the district court's determination. It's a shame, though, it did seem here that the district court was understandably impressed by what it viewed as the multitude of undisclosed items, the office actions and the three pieces of prior art that we've been discussing. But I think the court also addressed each one of those items independently on materiality and addressed the intent. I assume the purpose of the argument that the only thing the judge had to work with were the two balance actions. That was Judge Schall's hypothetical. What's your strongest case to say that we can affirm the district court's judgment on the intent and balance? I think it would be the Monsanto case. And if I could just add, separating the office actions from the German reference in this case doesn't work. What do you do with the stark scientific? We've had what might be viewed in a way as maybe not a sea change, but we've got a major wave that has been created in deciding intent. The recent case law of this court has shown a certain amount of nervousness by the court towards the issue of intent, being perhaps in some cases too easily found. And so why isn't the district court entitled to review the intent based on the two office actions through the lens of stark scientific? Because, Your Honor, I think in stark scientific, as I read it, it talks about that the only reasonable interpretation from the evidence is that there was an intent to deceive. And here there was numerous evidence. There was evidence on each one of these five items. No, no. The hypothetical has to do with three of the items being removed from consideration. We've got two left. And with respect to the office action, your adversary is saying, well, the two at the time that the re-exam patent was issued, as far as the re-exam panel knew, that good old Mr. Johnson was standing firm and had rejected it. And the additional art, now that the three pieces would have been eliminated, the art that the examiner Johnson was using collaterally was known to the resentment. You know, saying in the light of that, then you can't say that the only most reasonable inference you can draw of failing to disclose the two office actions is evil intent. I believe it is, Your Honor, from the evidence, the evidence of record. I think my reading of stark scientific was that you have to be able to show this reasonable explanation in the evidence. And there was no evidence offered on this point. Once it was established these items were withheld per deco, and they were shown to be withheld, both office actions, over and over again, there was no evidence. The case law is also talking about when is it that you need to come up with... Nobody. Not an inventor, not Mr. Patterson, nobody. And the law to me was quite clear that a plausible explanation has to be offered in the evidence once you've carried forth. Judge Maynard has a question. Just one more. It seems to me stark scientific made the point that at least some threshold level of intent has to be established before there is any obligation to come forth with good faith evidence. And the repeated withholding of office actions in this case, by the person who's handling the re-exam and the continuation applications, I believe meets that threshold of evidence just on the office actions. And I will try to continue to bring that German patent, which was cited in the office action, to that same individual who made the decision, the selection, to not turn in the information that appears to be pertinent. The case law that you're trying to take, for instance, is in which one panel was kept completely in the dark about what the other panel was doing, right? I believe that the... Remember Akron Palmer was the question of keeping everything completely in the dark. It was just sort of like something in the dark. And Akron Palmer said, well, you've got to draw some beneficial inference for at least not having kept the second panel entirely in the dark. When you're making selective decisions of what to keep the panel in the dark on and what not to keep the panel in the dark on, I think you go... That's part of the fine line is what happens when you go from saying, well, this is not an instance in which the patentee drew a Chinese ball between the two proceedings and did everything he could to make certain that one panel didn't even know the other one existed. Right? That day, I think. So here, there's a certain amount of slippage back and forth between the two panels. It's actually being encouraged by the patentee. And I think that, in view of McKesson, I believe that that slippage is actually part of the evidence of the intent. The selection of certain information and then withholding the highly material points of view to package it so that it appears that there are not problems and that you are doing things in good faith is actually the evidence of the intent. You would grant the case that your case is different if the three cases of Acker, Perk, or Excluder had been given. Would our case be different? Your case is different. Yes, absolutely. Mr. Qualtrough. Thank you. I've looked at this. You've had almost the amount of time we do for an in-bag argument. But I think we'll have to bring it to an end. Mr. John Garza, you will have... Let me give you... We'll give you four minutes of... Very well, Your Honor. I thought I was going to respond to their cross-appeal, and they haven't even addressed that. All right. On the exceptionality issue. And with the court's permission, should they go first on that since they have the burden? All right. They haven't brought it up. They haven't brought it up. Well, brief. All right. So we'll give you four minutes if you need it. And you'll have had maybe a minute less than Mr. Kowalchuk, but within the pale of reason. Your Honor, I don't believe all our main four minutes. But the question... Don't they hear you're wanting to be heard and that you haven't had a... Absolutely, Your Honor. Your Honors, and we appreciate you. Thank you very much. Very good questions. But let me say that fundamentally, should you decide theoretically that the three references are gone and we're only looking at the office actions, then I think that must go back down to the judge. He's got to look at it because no longer one of the office actions that had the German. If the German's not material, then that makes that office action less material. And that's going to have to be considered. That's going to have to be weighed. And I think the case will also have to be weighed based on the language in START, the holding in START. And so if you do decide that, then it has to go back down there. So that's all I have. Thank you, Your Honor. Thank you, Mr. Schiller. Thank you. Thank you again, Mr. Kowalka. The case is submitted.